# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DUSTIN LANCE,<br><br>     *Plaintiff,*<br><br>v.<br><br>1. BOARD OF COUNTY COMMISSIONERS OF PITTSBURG COUNTY, OKLA.<br>2. CHRIS MORRIS, Sheriff of Pittsburg County, Okla. in his official capacity<br>3. MIKE SMEAD, in his individual capacity,<br>4. DAKOTA MORGAN, in his individual capacity,<br>5. EDWARD MORGAN, in his individual capacity,<br>6. STEPHEN SPARKS, in his individual capacity,<br>7. MCALESTER REGIONAL HEALTH CENTER AUTHORITY, d/b/a McAlester Regional Hosptal,<br>8. GARY R. LEE, M.D.,<br>9. JOEL KERNS, former sheriff of Pittsburg County, in his individual capacity, and<br>10. DANIEL HARPER, in his individual capacity,<br><br>     *Defendants.* | Case No. CIV-17-378-RAW |

## ORDER AND OPINION[1]

     This action was originally filed in the District Court of Pittsburg County, Oklahoma. It was removed to this court on October 10, 2017. With leave to amend, Plaintiff filed two amended complaints, on December 8, 2017 and on September 7, 2018. In his Second Amended

---

[1]     For clarity and consistency herein, when the court cites to the record, it uses the pagination assigned by CM/ECF.

Complaint, Plaintiff alleges that Defendants were indifferent and failed to provide him with constitutionally adequate medical care in response to an emergent health condition.

Plaintiff brings the following claims:

I. Indifferent training and supervision pursuant to 42 U.S.C. § 1983 against Defendants Kerns and Morris[2];

II. Deliberate indifference to serious medical needs pursuant to § 1983 and the Oklahoma Constitution against Defendants Smead, Dakota Morgan, Edward Morgan,[3] Sparks, Harper, and the Board of County Commissioners of Pittsburg County, Oklahoma ("Board"); and

III. Unconstitutional policies or practices to deny adequate medical care pursuant to § 1983 against Defendants Kerns and Morris.[4]

Plaintiff requests judgment in his favor and damages in excess of $5,000,000.00. Now before the court are motions for summary judgment filed by former Sheriff Joel Kerns [Docket No. 129], by Edward Morgan [Docket No. 130], by Mike Smead [Docket No. 131], by the Board [Docket No. 135], by Sheriff Chris Morris [Docket No. 136], and by Daniel Harper, Dakota Morgan, and Stephen Sparks [Docket No. 137].[5]

---

[2]     Defendants Kerns and Morris are the former and current sheriffs of Pittsburg County, respectively. Plaintiff sued Defendant Kerns, the former sheriff, in his individual capacity. He sued Defendant Morris, the current sheriff, in his official capacity. At times Plaintiff refers to Defendant Morris as "County," and at other times as "Morris." The court refers to him as "Morris."

[3]     Edward Morgan is also known as "Tyler" Morgan. Docket No. 130, at 10.

[4]     Plaintiff also brings a claim for violation of the emergency medical transportation and active labor act pursuant to 42 U.S.C. § 1395DD ("EMTALA") against the McAlester Regional Health Center Authority ("MRHC" or "hospital") and Dr. Lee.

[5]     Also at issue is a motion for summary judgment filed by MRHC [Docket No. 128]. As the issues in MRHC's motion are distinct from the issues here, a separate Order will be entered on it simultaneously with this Order.

## I. <u>Standard of Review</u>

The court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In applying the summary judgment standard, the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). At this stage, however, Plaintiff may not rely on mere allegations, but must have set forth, by affidavit or other evidence, specific facts in support of the Complaint. *Id.*

"Conclusory allegations that are unsubstantiated do not create an issue of fact and are insufficient to oppose summary judgment." *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1136 (10th Cir. 2003) (citation omitted).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

While at the summary judgment stage evidence need not be submitted in a form that would be admissible at trial, the substance of the evidence must be admissible. For example, the court disregards "inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form." *Id.* (emphasis in original). "[A]ffidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence;

conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). Similarly, "[t]estimony which is grounded on speculation does not suffice to create a genuine issue of material fact to withstand summary judgment." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 876 (10th Cir. 2004).

Additionally, unauthenticated documents "cannot support a summary judgment motion, even if the documents in question are highly probative of a central and essential issue in the case." *Bell v. City of Topeka, Kan.*, 496 F.Supp.2d 1182, 1185 (D. Kan. 2007) (citation omitted). "To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo*, 452 F.3d at 1199.

### *Qualified Immunity*

The affirmative defense of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant raises a qualified immunity defense in response to a motion to dismiss or a motion for summary judgment,[6] the burden shifts to the plaintiff and the court employs a two-part test. *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012); *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011). The burden is a heavy one. *Perry v. Durborow*, 892 F.3d 1116, 1120 (10th Cir. 2018). A plaintiff must show that: (1) the defendant violated a constitutional

---

[6] "The legally relevant factors for a qualified immunity decision will be different at the summary judgment state – no longer can the plaintiffs rest on facts as alleged in the pleadings." *Stonecipher v. Valles*, 759 F.3d 1134, 1148, n.9 (10th Cir. 2014).

right, and (2) the constitutional right was clearly established at the time of the defendant's alleged misconduct. *Id.*

 "A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation." *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (citation omitted). A law is not clearly established unless existing precedent has "placed the statutory or constitutional question beyond debate." *Id.* (citation omitted). This is an objective test. *Brown*, 662 F.3d at 1164.

The court must not "define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (citing *Ashcroft*, 563 U.S. at 742); *Knopf*, 884 F.3d at 944 (citing *Ashcroft*, 563 U.S. at 742). A prior case need not have *identical* facts. *Perry*, 892 F.3d at 1126; *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017). Still, the "clearly established law must be 'particularized' to the facts of the case." *Knopf*, 884 F.3d at 944 (citation omitted).

A plaintiff must establish both prongs to defeat a qualified immunity defense. *Id.* Only if a plaintiff first meets this two-part test does the defendant bear the traditional summary judgment burden to show that there are no genuine disputes of material fact and that he or she is entitled to summary judgment as a matter of law. *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011). The court has discretion to decide which of the two prongs to address first in light of the circumstances of the case. *Brown*, 662 F.3d at 1164.


II.    <u>**State Law Claims**</u>

Plaintiff brought claims for deliberate indifference to serious medical needs in violation of Article II, Section 7 of the Oklahoma Constitution through *Bosh v. Cherokee Cnty.*

*Governmental Bldg. Auth.* 305 P.3d 994 (Okla. 2013) against Defendants Smead, Dakota Morgan, Edward Morgan, Sparks, Harper, and the Board.

In an Opinion issued on December 4, 2018, the Oklahoma Supreme Court declined to extend its ruling in *Bosh v. Cherokee Cnty. Governmental Bldg. Auth.* 305 P.3d 994 (Okla. 2013) "to include tort claims brought by inmates alleging violations of their rights to due process and to be free from cruel or unusual punishments." *Barrios v. Haskell Cnty. Pub. Facilities Auth., et al.*, 432 P.3d 233, 235-41 (Okla. 2018). The Court recognized that the Oklahoma Legislature responded to its decision in *Bosh* by amending the Oklahoma Governmental Tort Claims Act "to clarify that the State's immunity from suit extended even to so-called 'constitutional' torts." *Id.*

In his responses to Defendants' summary judgment motions, Plaintiff states that based on *Barrios*, he is no longer pursing any state law claims. Docket Nos. 163 at 14, 168 at 29, 169 at 24, 171 at 1, and 197 at 15. Accordingly, the motions are granted as to the state law claims.[7]

### III. <u>The Board</u>

In his brief response to the Board's motion for summary judgment, Plaintiff states that he is no longer pursuing any claim against the Board. Docket No. 171 at 1. Accordingly, the Board's motion is granted.[8]

### IV. <u>Undisputed Material Facts</u>[9]

---

[7]    The court declines Plaintiff's request to find the motions moot as to the state law claims. Based on the briefing, they are granted.

[8]    Again, the court declines Plaintiff's request to find the Board's motion moot. Based on the briefing, it is granted.

[9]    Where statements of material fact are admitted or undisputed, the court includes cites to the listed fact number in the motion or response as "UMF."

The court notes that the "statement of facts" in the motions filed by Sheriff Morris [Docket No. 136] and by Dakota Morgan, Stephen Sparks, and Daniel Harper [Docket No. 137]

1. Plaintiff was booked into the Pittsburg County Criminal Justice Center ("PCCJC" or "jail") on November 11, 2016 on charges of burglary in the second degree, possession of a controlled substance, and unlawful possession of paraphernalia. *Docket Nos. 130, 131, 136, and 137, UMF# 1 (admitted in Plaintiff's responses thereto).*

2. During Plaintiff's November 11, 2016 through December 18, 2016 incarceration at PCCJC, Joel Kerns was the Sheriff of Pittsburg County and as Sheriff, he oversaw the operation and supervision of the PCCJC. *Docket Nos. 136 and 137, UMF #2 (admitted in Plaintiff's responses thereto).*

3. PCCJC had a policy requiring all inmates be medically screened upon entering the facility "and before being placed in the general population or housing area." *Docket Nos. 136 and 137, UMF #3 (admitted in Plaintiff's responses thereto).*

4. Pursuant to PCCJC policy, a medical questionnaire was completed for and signed by Plaintiff. *Docket Nos. 136 and 137, UMF #4 (admitted in Plaintiff's responses thereto).*

5. As indicated on the medical questionnaire, during Lance's initial medical screening Lance indicated he was not: taking any prescription medication, medical treatments, or medical programs at that time; currently taking any medications prescribed by a doctor; having anyone bring him medications to the PCCJC; or aware of any medical problems that PCCJS should know about. *Docket Nos. 136 and 137, UMF #5 (admitted in Plaintiff's responses thereto).*

---

are identical. Appropriately, Plaintiff adopts his response to the "statement of facts" in the former motion in his response to the latter motion.

The court further notes that although the facts and issues in the motions filed by Sheriff Kerns [Docket No. 129] and Sheriff Morris [Docket No. 136] are quite different, Plaintiff filed a combined response to the two motions.

6. Prior to Plaintiff's arrest on November 11, 2016, Plaintiff had previously been incarcerated at PCCJC and experienced no issues or problems during those previous incarcerations. *Docket Nos. 136 and 137, UMF #6 (admitted in Plaintiff's responses thereto).*

7. Prior to Plaintiff's arrest in November 2016, a doctor had never prescribed him prescription drugs. *Docket Nos. 136 and 137, UMF #7 (admitted in Plaintiff's responses thereto).*

8. While incarcerated at the PCCJC from November 11, 2016 to December 19, 2016, Plaintiff was housed in A-Pod per his request. *Docket Nos. 136 and 137, UMF #8 (admitted in Plaintiff's responses thereto).*

9. While incarcerated at PCCJC on November 25, 2016, Plaintiff filled out a "medical request" form requesting that his wisdom teeth be pulled. On November 28, 2016, Plaintiff was taken to the Indian Clinic for dental treatment per his request. *Docket Nos. 130 and 131, UMF #2; 136, and 137, UMF #9 (admitted in Plaintiff's responses thereto).*

10. Following Plaintiff's dental work on November 28, 2016, Plaintiff was prescribed ibuprofen and penicillin. Jail staff administered the prescribed ibuprofen and penicillin to Plaintiff without incident. *Docket Nos. 136 and 137, UMF #10 (admitted in Plaintiff's responses thereto).*

11. On the evening of Thursday, December 15, 2016, shortly after dinnertime at around 5:00 p.m. or 6:00 p.m., Plaintiff took approximately three-fourths of a Trazadone pill given to him by another inmate. *Docket Nos. 130 and 131, UMF #3; 136, and 137, UMF #11 (admitted in Plaintiff's responses thereto).*

12. Plaintiff traded his next morning's breakfast for the Trazadone pill, which Plaintiff hoped to use as a sleeping aid on the night of Thursday, December 15, 2016. *Docket Nos. 130 and 131, UMF #4; 136, and 137, UMF #12 (admitted in Plaintiff's responses thereto).*

13. Plaintiff had taken smaller doses of Trazadone from this inmate on previous occasions during his November 11, 2016 through December 19, 2016 stay at PCCJC, but before December 15, 2016, he had never taken up to three-fourths of a Trazadone pill. *Docket Nos. 130 and 131, UMF #5; 136, and 137, UMF #13 (admitted in Plaintiff's responses thereto).*

14. Plaintiff was not prescribed Trazadone and was not provided Trazadone through a "pill pass" by jailers or any other employee of the PCCJC. *Docket Nos. 130 and 131, UMF #6; 136, and 137, UMF #14 (admitted in Plaintiff's responses thereto).*

15. Plaintiff knew that the pill he took was Trazadone. *Docket Nos. 130 and 131, UMF #7; 136, and 137, UMF #15 (admitted in Plaintiff's responses thereto).*

16. Sometime after Plaintiff took the Trazadone pill, he fell asleep and then re-awoke in the early hours of Friday, December 16, 2016 with an erection. He used the restroom, and as he was unconcerned about his erection, he made no one aware of his condition. *Docket Nos. 130 and 131, UMF #8; 136, and 137, UMF #16 (admitted in Plaintiff's responses thereto).*

17. Plaintiff claims he had a prolonged erection from the early hours of Friday, December 16, 2016 to the morning of December 19, 2016 when he was sent to the emergency room for treatment. *Docket Nos. 130 and 131, UMF #9 (admitted in Plaintiff's responses thereto).*

18. Plaintiff testified that he awoke maybe three times in the early morning hours of December 16, 2016, but did not become alarmed until around breakfast time. Plaintiff

testified that early in the morning hours of December 16, 2016, he used the intercom inside his cell and informed Edward "Tyler" Morgan that he had taken "that pill [he] found on the floor" the previous night and had an erection. *Docket Nos. 136 and 137, UMF #s 17 and 18 (admitted in part and disputed in part[10] in Plaintiff's responses thereto); and Plaintiff's Depo., Docket No. 138-2, at 16-24.*

19. Plaintiff took the Trazadone approximately twelve hours before he notified anyone of his hours-long erection. There is no evidence, however, that Plaintiff experienced any painful or negative side-effects that would warrant reporting until sometime after 5:00 a.m. on December 16, 2016. *Docket Nos. 136, 137, UMF #19; and 168.*

20. Plaintiff's unauthorized use of another inmate's prescription Trazadone resulted in a priapism, which is a prolonged erection without stimulation that will not dissipate or go away without medical intervention. *Docket Nos. 136 and 137, UMF #20 (admitted in Plaintiff's responses thereto).*

21. Plaintiff testified that he was in so much pain that he removed his jail pants on Friday and kept them off until he saw the nurse on Monday. *Docket No. 168, UMF #17; Docket No. 172-11 at 38-39 and 137-39.*

22. Plaintiff claims that from the morning of December 16, 2016 through the morning of December 19, 2016, he made repeated requests for help utilizing the intercom system and to each and every jailer he encountered. *Plaintiff Depo., Docket No. 172-11 at 73, 93, 113-14, 118 and 124; Plaintiff Decl., Docket No. 172-19 at 1-2.*

---

[10]     Defendants maintain Plaintiff used the intercom at approximately 6:00 a.m. In his response, Plaintiff maintains it was sometime after 5:00 a.m., but before 6:00 a.m. Docket No. 168, at 8, responses to UMF #s 17, 18, and 19.

23. All Defendants deny that Plaintiff made anyone aware of his condition until about 9:20 a.m. on Monday, December 19, 2016, when a jailer became aware of Plaintiff's condition and immediately took him to Jail Nurse Doris Crawford.[11]  *Docket Nos. 136, and 137, UMF #21 ("disputed as phrased" in Plaintiff's responses thereto).*  As noted by Plaintiff, however, there is evidence that other jailers knew, particularly Mike Smead.  *Nurse Crawford's Depo., Docket No. 172-13 at 70-72; Declarations of Plaintiff and other inmates, Docket Nos 172-19, 172-8, 172-9, and 172-10.*

24. Two inmates signed declarations stating that in December 2016, they observed Plaintiff walking around the pod with a visible erection, that it was obvious he was in pain from it, and that they heard and observed him reporting it to guards and asking them for help and medical treatment.  *Declarations of Jones and Stewart, Docket Nos. 172-8 and 172-10.*

25. None of the jailers contacted Nurse Crawford about Plaintiff from December 16-18, 2016.  *Docket No. 169, UMF. # 8.*

26. During Plaintiff's initial interview with Nurse Crawford, he was a little apprehensive in telling her what medication he took and when he took it.  *Nurse Crawford Depo., Docket No. 138-9 at 14 and PCCJC Progress Note, Docket No. 138-15.*

27. After Plaintiff disclosed to Nurse Crawford that he had taken Trazadone and when he took it, she examined his erection and immediately arranged his transport to MRHC's emergency room for further treatment.  *Docket Nos. 129, UMF #1; 136 and 137, UMF #23 (admitted in Plaintiff's responses thereto).*

---

[11]     Doris Crawford was previously, but after Plaintiff's Second Amended Complaint, is no longer a Defendant to this action.

28. Plaintiff received no medical care for his condition at the jail until he saw Nurse Crawford at 9:20 a.m. on December 19, 2016.  *Docket No. 169, UMF #9.*

29. At approximately 9:30 a.m., Detention Officer Stephen Sparks transported Plaintiff to MRHC, but was relieved by jailer Brandon Wilkins[12] while at the hospital and did not bring Plaintiff back to the jail following his medical visit at the hospital.  *Docket Nos. 136 and 137, UMF #24 (admitted in Plaintiff's responses thereto).*

30. At 11:47 a.m. on December 19, 2016, Lance was seen at MRHC by Dr. Lee, who diagnosed Plaintiff with priapism and treated him with injection, which failed to remedy the priapism.  Between 12:01 p.m. and 12:50 p.m., Dr. Lee referred Plaintiff to a urologist in Tulsa at St. Francis Medical Center.  *Docket Nos. 136 and 137, UMF #25 (admitted in Plaintiff's responses thereto).*  Dr. Lee directed that Plaintiff be transported to St. Francis immediately, but did not indicate on the transfer request form the means by which Plaintiff was to be transported.  *Docket Nos. 129, UMF #2 and 168, response to UMF #2.*

31. By 1:15 p.m., Plaintiff was returned to the PCCJC to be discharged on a medical recognizance bond.  *Docket Nos. 136 and 137, UMF #26 ("disputed as phrased" in Plaintiff's responses thereto).*  Plaintiff adds that Dr. Lee unequivocally instructed the jailers to immediately transport him to St. Francis.  *Note by Dr. Lee, Docket No. 172-6.*

---

[12]     Brandon Wilkins is not and never was a Defendant to this action.

32. While Nurse Crawford understood that Plaintiff needed to go to St. Francis as soon as possible, she did not believe he required an ambulance. *Docket Nos. 136 and 137, UMF #27 ("disputed as phrased" in Plaintiff's responses thereto).*[13]

33. At 2:42 p.m. Plaintiff was released from the PCCJC on a medical recognizance bond and discharged to his father, who Nurse Crawford personally told to take Plaintiff to the urologist "now." *Docket Nos. 136 and 137, UMF #28 (admitted in Plaintiff's responses thereto).*

34. After being discharged, Plaintiff accompanied his father and stepmother on several errands before his father drove him to St. Francis Medical Center in Tulsa, arriving at 7:16 p.m. Plaintiff underwent surgery for his priapism around 9:00 p.m. *Docket Nos. 136 and 137, UMF #29 (admitted in Plaintiff's responses thereto).*

### *PCCJC Policies & Training*

35. In December of 2016, PCCJC inmates were observed through direct supervision from a jailer in a tower, through video surveillance in the tower, and by two jailers in the booking area. *Docket No. 168, UMF #11; Manual, Docket No. 172-2 at 45-46.*

36. The tower post for the jailer supervising the housing unit Plaintiff occupied has large glass windows allowing close supervision of the population and the physical condition of the inmates. *Docket No. 197, UMF #20; Tower photo, Docket No. 172-20.*

37. Pursuant to PCCJC policy, jail staff kept a detailed log, often referred to as "the bible" of the daily activity within the male tower. These logs show who was on duty per each shift and further indicate itemized items for shift changes, site checks, medication pass, meal

---

[13] Plaintiff argues this is irrelevant and that it is not supported by evidence that she was qualified to render opinions about the need for transport by ambulance in cases of a 96-hour priapism.

pass, any significant incidents, and anyone making any request to the jailers during these time frames. There are no entries in these logs with regard to Plaintiff's medical condition until Monday, December 19, 2016 at 9:15 a.m. when Detention Officer Homer McOwen takes "one male inmate from A-Pod to Booking." *Docket Nos. 136 and 137, UMF #40 ("disputed as phrased" in Plaintiff's responses thereto).* Plaintiff argues that the log contains a variety of entries that are unreliable and unverified.

38. The Booking Log for December 19, 2016 states that at 9:30 a.m. Sparks took Plaintiff to the doctor. The Log further indicates that at 1:15 p.m. Plaintiff was back from MRHC and at 2:45 p.m. Plaintiff was released on a medical personal recognizance bond. *Docket Nos. 136 and 137 (admitted in Plaintiff's responses thereto).*

39. The PCCJC had a policy in reference to Oklahoma State Jail Standards: "to provide adequate medical care in a jail facility by maintaining an established healthcare plan that states what is to be done in situations involving the health and medical care of inmates in this facility." *Docket Nos. 129, UMF # 5 (admitted in Plaintiff's responses thereto); Docket Nos. 136 and 137, UMF #42 ("disputed as phrased" in Plaintiff's response thereto).* Plaintiff argues the policy relates to medical care "in the facility" and that PCCJC has a practice of disregarding physicians' orders to transport inmates with emergent medical needs and instead transporting them back to the jail to be released first. *Docket No. 168, responses to Kerns' UMF #5 and Morris' UMF #42, (citing Kerns Depo., Docket No. 172-12 at 32-33 and 55-57).*

40. Oklahoma has standards for jail facilities that require a prisoner count at the beginning of each shift change and "at least one (1) visual sight check every hour which, shall include all areas of each cell and such sight checks shall be documented." OKLA. ADMIN. CODE.

§ 310:670:5-2(2) and (3). Oklahoma further requires that each prisoner be served three meals per day. OKLA. ADMIN. CODE. § 310:670:5-7(1).[14]

41. Pursuant to PCCJC policy, prior to sending a prisoner to the medical facility, an officer must fill out a medical clearance form. "Instructions on the medical clearance form must be followed. If the conditions that are prescribed cannot be carried out by the jail staff, the shift supervisor will be notified immediately to attempt to get the prisoner OR'd." *Docket No. 168, UMF #3; Manual, Docket No. 172-2 at 7.*

42. Pursuant to PCCJC policy, the MRHC and the ambulance service provided PCCJC with the necessary medical services to inmates and Sheriff's Office personnel on an as needed basis. Due to the close proximity to this facility, medical care was less than five minutes away and available to use twenty-four hours daily. *Docket Nos. 129, UMF # 5 (admitted in Plaintiff's response thereto); Docket Nos. 136 and 137, UMF #43 ("disputed as phrased" in Plaintiff's responses thereto).* Plaintiff argues the policy is one in name only. *Docket No. 168, response to Morris' UMF #43.*

43. Once at the MRHC, if a doctor recommends an inmate be transported directly from the ER to another hospital, the sheriff and his staff do not have the discretion to release the inmate without the higher authority of the district attorney or a judge. *Docket No. 168, UMF #12 and 15; Manual, Docket No. 172-2 at 55-57.*

44. The only medical services provided at the jail were through the nurse who was at the jail Monday through Friday from 8:00 a.m. to 5:00 p.m. There was no physician on call. If the nurse was not there, a jailer, usually a jail administrator, could call the attending

---

[14]     Plaintiff points out that under Oklahoma's jail standards, from December 16 – 19, 2016, the jailers would have had contact with Plaintiff a total of 97 times for site checks, meals, pill passes, and head counts. *Docket No. 169, UMF #18.*

physician at MRHC. *Docket No. 168, UMF #6; Kerns Depo., Docket No. 172-12 at 13-14 and 18.* While Nurse Crawford did not work on the weekends, she was on call if situations arose that required consultation with her. *Docket No. 131, UMF 11 (admitted in Plaintiff's response thereto).*

45. Pursuant to PCCJC policy, inmates are informed upon admission to PCCJC the process for gaining access to medical and healthcare services. This information is given to said inmates in writing along with a copy of the jail rules. *Docket Nos. 136 and 137, UMF #44 (admitted in Plaintiff's responses thereto).*[15]

46. Pursuant to PCCJC policy, inmates are informed that a medical request form can be filled out and submitted to the jailers or to jail staff if an inmate needs medical care. *Docket Nos. 136 and 137, UMF #45 (admitted in Plaintiff's responses thereto).*[16]

47. Pursuant to PCCJC policy, supervisors determine the immediacy of medical complaints and take appropriate action. *Docket Nos. 136 and 137, UMF #46 (admitted in Plaintiff's responses thereto); Docket No. 168, UMF #1.*

48. Pursuant to PCCJC policy, jailers address an inmate's medical request by using their own discretion and common sense to assess the severity of the medical need, by immediately referring all such requests up the "chain-of-command" to their shift sergeant, Nurse Crawford, and the Jail Administrator. *Docket Nos. 129, UMF # 6; 136 and 137, UMF # 47 (admitted in Plaintiff's responses thereto); Docket No. 168, UMF #7.*

49. Pursuant to PCCJC policy, jailers are responsible for ensuring that inmates who request medical attention are given the proper form to fill out and that the appropriate supervisor

---

[15]     Plaintiff argues this is not relevant.
[16]     Plaintiff argues this is not relevant.

is notified so said supervisor can determine if the inmates requesting medical attention require transport to the MRHC emergency room. *Docket Nos. 136 and 137, UMF # 48 (admitted in Plaintiff's responses thereto); Docket No. 168, UMF #2.*

50. Pursuant to PCCJC policy, inmate prescription medication is administered in compliance with the orders of a licensed physician or designated medical authority. *Docket Nos. 136 and 137, UMF #49 (admitted in Plaintiff's responses thereto).*

51. Following policy was mandatory. *Docket No. 168, UMF #4; Kerns Depo., Docket No. 172-12 at 10.*

52. Sheriff Kerns testified that he agreed that any deviation from a policy could expose an inmate to a greater risk. *Docket No. 168, UMF #5; Kerns Depo., Docket No. 172-12 at 10-11.*

53. The jailer Defendants knew and understood the procedure of reporting an inmate's medical needs as outlined by the PCCJC policies. *Docket Nos. 129, UMF #7 (admitted in Plaintiff's response thereto); 136 and 137, UMF #50 ("disputed" in Plaintiff's response thereto).* Plaintiff does not actually dispute the fact, but argues the jailers here did not report Plaintiff's medical needs.

54. The jailer Defendants recognized that if Plaintiff had, in fact, made a jailer aware of his medical condition prior to Monday, December 19, 2016, but was not granted access to medical care, such conduct would violate PCCJC policy. *Docket Nos. 136 and 137, UMF #51 (admitted in Plaintiff's responses thereto).*

55. PCCJC jailers completed a state mandated training course that included lessons in basic First Aid and CPR. *Docket Nos. 129, UMF #10 ("disputed" in Plaintiff's response thereto); 136 and 137, UMF #52 (undisputed in Plaintiff's responses thereto).*[17]

56. In addition to the state mandated course, the PCCJC also utilized mentoring or shadowing on-the-job training practice whereby newly hired jailers would shadow or be mentored by a more experienced jailer on policies and practices. Such shadowing or mentoring would last anywhere from a month to two months. *Docket Nos. 129, UMF #11 (admitted in Plaintiff's response thereto); 136 and 137, UMF #53 (undisputed in Plaintiff's responses thereto).*

57. Sheriff Kerns testified that he was not aware of any additional or special training for the jail staff regarding handling inmates with medical needs. Any such training would have been under the normal jail standards or whatever the State provides. *Docket No. 168, UMF #8; Kerns Depo., Docket No. 172-2 at 32-22.*

58. PCCJC held monthly safety meetings for jail staff. *Docket Nos. 136 and 137 (undisputed in Plaintiff's responses thereto).*

59. For every shift at PCCJC, a staff sergeant oversaw PCCJC and supervised the detention officers on shift. *Docket Nos. 136 and 137, UMF #51 (admitted in Plaintiff's responses thereto).*

---

[17]     In his response to Sheriff Kerns' motion, Plaintiff states that he disputes this fact, but cites no support. He simply states that it is not supported by testimony of every jailer. This is insufficient to dispute the fact. Additionally, Plaintiff does not dispute the very next listed fact that in addition to the state mandated course, the PCCJC provided further on-the-job training. In response to Sheriff Morris' motion, Plaintiff states the fact is vague and not relevant.

### Daniel Harper

60. In December of 2016, Daniel Harper was a jailer at PCCJC. *Docket Nos. 136 and 137, UMF #30 (admitted in Plaintiff's responses thereto).*

61. During the relevant period, December 15, 2016 to December 19, 2016, Harper worked one shift, as a supervisor, from 6:00 p.m. Sunday, December 18, 2016 to 6:00 a.m. Monday, December 19, 2016. *Timesheets, Docket No. 172-1, at 5; Harper Depo., Docket No. 172-17 at 20-25.*

62. Harper testified that he has no recollection of any interaction with Plaintiff. *Harper Depo., Docket No. 172-17 at 24.*

63. Harper passed out breakfast trays at 5:29 a.m. on December 19, 2016. The meal trays are placed on a rolling cart. The jailer takes the cart to each housing unit, waits for the inmate to come up to the "bean hole," and hands him a tray. *Harper Depo., Docket No. 172-17 at 25-26.*

64. Harper testified that did he not hear of the Plaintiff's medical condition while he was on night shift the evening of December 18, 2016. *Harper Depo., Docket No. 172-17 at 33.*

65. Harper subjectively knew that a prolonged and painful erection required medical attention. *Harper Depo., Docket No. 172-17 at 48-49.*

66. Harper was in the tower that night and was to perform welfare checks from the tower and while cleaning. *Harper Depo., Docket No. 172-17 at 30-31 and 39.* Plaintiff argues that his condition would have been obvious from the vantage point of the tower. *Tower photo, Docket No. 172-20.*

### *Dakota Morgan*

67. In December of 2016, Dakota Morgan was a Detention Officer at PCCJC. *Docket Nos. 136 and 137, UMF #34 (admitted in Plaintiff's responses thereto).*

68. During the relevant period, December 15, 2016 to December 19, 2016, Dakota Morgan worked three day shifts from 6:00 a.m. through 6:00 p.m. on December 15, 16, and 17. *Docket Nos. 136 and 137, UMF #36 (admitted in Plaintiff's responses thereto); Timesheets, Docket No. 172-1 at 11; Morgan Depo., Docket No. 172-16 at 9-10; Docket No. 197, UMF #1.*

69. Dakota Morgan testified that during his December 15-17 shifts, Plaintiff would have been in his care and his responsibility. *Docket No. 197, UMF #3; D. Morgan Depo., Docket No. 172-16 at 29.*

70. Dakota Morgan worked in the tower from noon until 6:00 p.m. on Friday, December 16, 2016. *Docket No. 197, UMF #4; D. Morgan Depo., Docket No. 172-16 at 48.* The intercom that was in Plaintiff's cell rings through to the tower. *Docket No. 197, UMF #5; D. Morgan Depo., Docket No. 172-16 at 32-33.*

71. Plaintiff had no recollection of speaking with Dakota Morgan at any point during his incarceration. *Plaintiff Depo., Docket No. 172-11 at 236.* Plaintiff, however, claims that he contacted the person in the tower during the time Dakota Morgan was posted there and told the person of his priapism and considerable pain. *Plaintiff Decl., Docket No. 172-19 at 1-2.*

72. Dakota Morgan testified that first he knew of Plaintiff after his return from the hospital. *D. Morgan Depo., Docket No. 172-16 at 28-29.*

73. Dakota Morgan testified that he understood that an erection that would not go away would be a serious medical issue. He testified that if informed of such, he would immediately inform the sergeant and if he felt the sergeant was not handling it properly, he would inform the nurse. *Docket No. 197, UMF #2; D. Morgan Depo., Docket No. 172-16 at 15.*

### Stephen Sparks

74. During the relevant period, December 15, 2016 to December 19, 2016, Stephen Sparks worked the day shift in the PCCJC kitchen – from 8:00 a.m. to 5:00 or 6:00 p.m. – on December 18 and 19. *Docket Nos. 136 and 137 (admitted in Plaintiff's responses thereto); Docket No. 197, UMF #17.*

75. Sparks also worked as a transport jailer. *Docket No. 197, UMF #18, Sparks Depo., Docket No. 172-18 at 10-11.*

76. Other than to transport Plaintiff to MRHC on the morning of December 19, 2016, Sparks testified that he did not interact with Plaintiff on December 18 or 19, 2016 and had no knowledge of any medical condition of Plaintiff. *Sparks Depo., Docket No. 172-18 at 29-30.*[18]

77. When Sparks took Plaintiff to the ER, he observed that Plaintiff was visibly in pain. *Docket No. 197, UMF #s 19 and 20; Sparks Depo., Docket No. 172-18 at 36 and 42.*

### Mike Smead

78. In December 2016, Mike Smead was a sergeant who worked on the day shift from 6:00 a.m. to 6:00 p.m. *Docket No. 131 (admitted in Plaintiff's response thereto); Docket No. 169, UMF #1.*

---

[18] Plaintiff argues this is not relevant.

79. During the relevant period, Smead worked the day shifts for December 15-17, 2016. He did not work Sunday, December 18, 2016. *Docket No. 131, UMF #24 (admitted in Plaintiff's response thereto); Docket No. 169, UMF #2.*

80. Mike Smead testified that he was not aware of Plaintiff's condition until it was reported in the McAlester New Capital. *Smead Depo., Docket No. 172-14 at 75.* He testified that he has no memory of being told. *Id. at 87-88.* He further testified that if he had been told about an inmate having a prolonged erection, that he thinks it would stand out in his memory. *Id. at 88-89.* He testified that if he had heard of an inmate having such a condition, he would have contacted the nurse, and if he could not reach her, then the jail administrator, and he would take the steps necessary to get the inmate medical treatment. *Id. at 89.*

81. Plaintiff testified that he spoke with Smead around lunchtime, telling him that "I took a pill, I've had a hard-on for longer than I should, and I needed to see the nurse." *Docket No. 131, UMF #15 (admitted in Plaintiff's response thereto) Plaintiff Depo., Docket No. 172-11 at 99.* Plaintiff testified that he showed Smead his penis probably a couple of times throughout the weekend and that he told him every time he saw him about his condition. *Plaintiff Depo., Docket No. 172-11 at 118 and 124.*

82. Plaintiff testified that during the times he spoke with Smead about his condition, Smead "kind of snickered," but then would also try to be sympathetic and say he was trying to get ahold of the nurse. *Plaintiff Depo., Docket No. 172-11 at 155-56.*

83. Nurse Crawford testified that when she asked Smead why no one called her, Smead replied that he thought Plaintiff was just playing. *Crawford Depo., Docket No. 172-13 at 70-71.*

### Edward "Tyler" Morgan

84. In December 2016, Edward Morgan was a sergeant who worked only night shifts from 6:00 p.m. to 6:00 a.m. the following day. *Docket No. 130, UMF #10 (admitted in Plaintiff's response thereto).*

85. During the night shift, sight checks of the male pods were generally done by the jailer in the tower, not a jailer in the pod area. *Docket No. 130, UMF #11 (admitted in Plaintiff's response thereto).*

86. Plaintiff testified that Edward Morgan was the first jailer he told about his erection problem, doing so via the intercom before or after breakfast on December 16, 2016. *Docket No. 130, UMF #14 and 15 (admitted in Plaintiff's response thereto).*

87. Plaintiff claims to have spoken to Edward Morgan only the one time in jail via the intercom around breakfast time on December 16, 2016. *Docket No. 130, UMF #17 (admitted in Plaintiff's response thereto).* Plaintiff testified that he knew it was "Tyler" Morgan because he remembered his voice. *Lance Depo. Docket No. 172-11 at 94.*

88. Edward Morgan disputes that Plaintiff informed him of his condition via the intercom, as he was not in the control tower. *Edward Morgan Depo., Docket No. 172-15 at 73 and 95-98.* Edward Morgan further testified that the fact that there is no notation in the tower logbook suggests that Plaintiff did not use the intercom and inform any jailer. *Id.* at 98. Edward Morgan testified that he was not aware of Plaintiff's priapism until at least December 29, 2016 when he returned to work after taking vacation days. *Id. at 49-50 and 92.*

89. The tower log shows that Edward Morgan moved an inmate and was passing out medications on the December 15, 2016 night shift. *Tower Log, Docket No. 130-7.*

90. Edward Morgan testified that if informed of a medical problem, he would start with the chain of command unless there was a pressing medical need and he had to act right then. *Id*. at 99-100.

### *Sheriff Kerns*

91. Sheriff Kerns was not aware of Plaintiff's priapism on or before Monday, December 19, 2016, and was not involved in the assessment, diagnosis, transportation, or treatment of Plaintiff. *Docket No. 129, UMF # 3 (undisputed in Plaintiff's response thereto)*.[19]

92. Sheriff Kerns performed his duties maintained normal office hours in December 2016. *Kerns Depo., Docket No. 129-13 at 4-5; Edward Morgan Depo., Docket No. 126-6 at 5; Sparks Depo., Docket No. 129-15 at 5*.[20]


## V.    Claims Against Defendants Sued in their Individual Capacities[21]

Plaintiff brought § 1983 claims against Edward Morgan, Mike Smead, Daniel Harper, Dakota Morgan, and former sheriff Joel Kerns in their individual capacities. These Defendants deny that they violated Plaintiff's constitutional rights. They also assert the affirmative defense of qualified immunity.

Plaintiff alleges that Defendants Smead, Harper, Dakota Morgan, and Edward Morgan were deliberately indifferent to his serious medical needs in violation of his constitutional rights.

---

[19]    Plaintiff argues this fact is not relevant, as Sheriff Kerns' personal involvement is not required for supervisor liability.

[20]    While Nurse Crawford speculated that Kerns was absent in December following the loss of his son and the November election, she also acknowledged that she did not actually know whether he was in the office. Docket No. 129-7 at 11.

[21]    Plaintiff has abandoned his claim against Defendant Stephen Sparks based on evidence that Sparks was not the transport jailer who returned him to the PCCJC. *Plaintiff's Resp., Docket No. 197 at 1-2*. Accordingly, Sparks' motion for summary judgment is granted.

Specifically, he claims that despite knowledge of his condition, they did not get him any medical help on December 16, 17, and 18, 2016.  He also claims he should have been taken directly to St. Francis from MRHC on December 19, 2016.

Plaintiff claims that Defendant Sheriff Kerns failed to provide supervision over the PCCJC and that Sheriff Kerns adopted and enforced policies or practices that permitted jail staff to ignore Plaintiff's emergent medical needs and the physician's order to immediately transport him to St. Francis.  He claims Sheriff Kerns' failures were the moving force behind the jailers' delaying and denying Plaintiff medical treatment.

Pretrial detainees are protected from deliberate indifference to their serious medical needs under the Fourteenth Amendment rather than the Eighth Amendment.  *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999).  Nevertheless, the analysis is identical.  *Id*.  To prevail on a § 1983 claim of deliberate indifference to serious medical needs, proof of negligence or "inadvertent failure to provide adequate medical care" is not enough.  *Self v. Crum*, 430 F.ed 1227, 1230 (10th Cir. 2006).  A plaintiff must show "acts or omissions sufficiently harmful to evidence *deliberate indifference to serious medical needs*."  *Id*. (emphasis added).

To that end, a plaintiff must satisfy a two-pronged inquiry, comprised of an objective and subjective component.  *Id*. (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)).  "Under the objective inquiry, the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension."  *Id*. (citation omitted).  Under the subjective inquiry, the official "must have a 'sufficiently culpable state of mind.'"  *Id*. at 1230-31 (citation omitted).  An official "cannot be liable unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id*.

at 1231. (citation omitted). "The fact that a serious medical need was 'obvious' could be evidence of deliberate indifference, although a 'prison official may show that the obvious escaped him' and avoid liability." *Id.* (citation omitted).

Citing *Kingsley v. Hendrickson*, --- U.S. ---, 135 S.Ct. 2466 (2015), Plaintiff argues that because he was a pretrial detainee protected under the Fourteenth Amendment, the court must apply only the objective component of the traditional analysis to determine whether Defendants were deliberately indifferent to his medical needs. The Tenth Circuit has noted that *Kingsley* involved "an excessive-force claim where there was no question about the intentional use of force against the prisoner," and the analysis therein "may not apply to a failure to provide adequate medical care or screening, where there is no such intentional action." *Crocker v. Glanz*, 752 Fed.Appx. 564, 569 (10th Cir. 2018) (unpublished).

While the Tenth Circuit has not yet definitively ruled on the issue,[22] the court believes that the subjective element – the defendant's state of mind, that he acted *deliberately* – is necessary to prove a claim of *deliberate indifference* to serious medical needs under either a Fourteenth Amendment or an Eighth Amendment analysis. Like the Northern District of Oklahoma, this court will follow existing Tenth Circuit precedent. *See Burke v. Regalado*, No. 18-CV-231-GKF-FHM, 2019 WL 1371144, *4 (N.D. Okla. Mar. 26, 2019) ("Because *Kingsley* did not address the standard applicable to a pretrial detainee's denial of medical care claim, this court follows existing Tenth Circuit precedent as to the appropriate standard.").

---

[22] The Tenth Circuit has since noted the split amongst the Circuits on this issue, but has not yet definitively ruled on it. *Burke v. Regalado*, --- F.3d ---, No. 18-5042 and 18-5043, 2019 WL 3938633 at * 14, n. 9 (10th Cir. Aug. 20, 2019); *Estate of Vallina v. County of Teller Sheriff's Office*, 757 Fed.Appx. 643, 646-47 (10th Cir. 2018) (unpublished).

Plaintiff has produced evidence that he suffered from a priapism at the jail from the early morning hours of Friday, December 16, 2016 until he was sent to MRHC on the morning of Monday, December 19, 2016.  He testified and two other inmates also declared that he told every guard with whom he came into contact about his condition and need for medical assistance.  He has presented evidence that under the rules and practices of the jail, he would have come in contact with guards on numerous occasions during the weekend.  He has presented evidence that he took off his pants and walked around his cell without them over the weekend.

Defendants do not argue the objective prong of the test for deliberate indifference to a serious medical need, conceding that Plaintiff has submitted sufficient evidence that the deprivation was "sufficiently serious" to constitute a deprivation of constitutional dimension. Instead, Defendants argue that there is not evidence to support the subjective prong of the deliberate indifference test.  They each deny knowledge of his condition.  They also argue that they did not violate a clearly established constitutional right.  The court, of course, considers the claims against and defenses of each Defendant separately.

### Edward "Tyler" Morgan – Sergeant[23]

In December 2016, Edward Morgan worked night shifts from 6:00 p.m. to 6:00 a.m. Plaintiff claims that sometime in the early morning of December 16, 2016, the first jailer he told of his condition was Edward Morgan over the intercom.  Plaintiff claims he recognized Edward Morgan's voice.  Plaintiff claims to have spoken to Edward Morgan only the one time.  *Lance Depo., Docket No. 172-11 at 60 and 234.*  He told Edward Morgan that he had taken a pill he

---

[23]     Plaintiff makes no claims against Edward Morgan with regard to being taken directly from MRHC to St. Francis.

found on the floor and had an erection he could not "get rid of."  *Lance Depo., Docket No. 172-11 at 42-43, 51-52, 59 and 93-95*.  While Edward Morgan disputes these allegations, viewing the evidence in the light most favorable to Plaintiff, for purposes of the motion for summary judgment, the court accepts them as true.

Taking the facts in the light most favorable to Plaintiff, he has not shown that Edward Morgan was deliberately indifferent to his serious medical needs.  He has failed to prove the subjective prong of the deliberate indifference test.  In the early morning hours of December 16, 2016, Plaintiff's erection had persisted for a few hours at most.  Plaintiff told Edward Morgan that he took a pill and had an erection.  There is no evidence that Plaintiff told Edward Morgan when the erection began, how long it had lasted, or that he was in considerable pain.  Plaintiff has not presented evidence sufficient to show that Edward Morgan was deliberately indifferent to his serious medical needs.

As the court finds that Edward Morgan did not violate Plaintiff's constitutional rights, Edward Morgan is also entitled to qualified immunity.  Moreover, under these particularized facts, Plaintiff has failed to show Edward Morgan violated any clearly established constitutional right.  Accordingly, Edward Morgan's motion for summary judgment is granted.

### *Mike Smead – Sergeant*[24]

In December 2016, Mike Smead worked day shifts from 6:00 a.m. to 6:00 p.m.  Smead worked on December 15, 16, and 17.  He did not work on Sunday, December 18.  Viewing the evidence in the light most favorable to Plaintiff, for purposes of this motion, the court accepts as true the following facts: Plaintiff told Smead that he took a pill, had a prolonged erection, and

---

[24]     Plaintiff makes no claims against Mike Smead with regard to being taken directly from MRHC to St. Francis.

needed to see the nurse. Additionally, Plaintiff showed Smead his penis a couple of times and told Smead about his condition every time he saw Smead. Plaintiff has raised material issues of fact as to whether Smead was deliberately indifferent to his serious medical needs.

Nevertheless, as Smead has asserted the defense of qualified immunity, Plaintiff has the heavy burden to show not only that his constitutional right was violated, but that the right was clearly established. Plaintiff need not identify a case with identical facts, but must identify a case where an official acting under similar circumstances as Smead was held to have violated the Constitution. *Perry*, 892 F.3d 1123-26. In response to Smead's assertion of qualified immunity, Plaintiff argues that a detainee's right to medical care is clearly established.

Plaintiff further argues that severe pain triggers a duty for a medical professional to respond. *See Al-Turki v. Robinson*, 762 F.3d 1188 (10th Cir. 2014). *Al-Turki* is the most analogous case cited by Plaintiff. In that case, the plaintiff, a diabetic, had pain so severe, he had collapsed, vomited, and believed he was dying. Ultimately, it was determined that his pain was caused by a kidney stone, so the defendant nurse argued it was not serious. The Circuit Court held that the pertinent question for determining entitlement to qualified immunity depends on the facts known at the time. In *Al-Turki*, at the time the defendant chose to ignore the plaintiff's request for medical treatment, the "situation she confronted" was a diabetic inmate who had collapsed on the floor, repeatedly vomited, and complained of severe abdominal pain.

In this case, Plaintiff told Smead that he had taken a pill and had a prolonged erection. Plaintiff does not point to any case where an official acting under similar circumstances as Smead was held to have violated the Constitution. Plaintiff has not met his heavy burden. Accordingly, Smead is entitled to qualified immunity, and his motion is granted.

### _Daniel Harper – Jailer_[25]

During the relevant period, Daniel Harper worked one night shift on from 6:00 p.m. on Sunday, December 18 to 6:00 a.m. on Monday, December 19.  Harper passed out breakfast trays before his shift ended on Monday, December 19.  He also worked in the tower that night and was to perform welfare checks from the tower and while cleaning.  Plaintiff does not make any allegations with regard to speaking to Harper specifically.[26]  Viewing the facts in the light most favorable to Plaintiff, however, there is a genuine issue of material fact as to whether Harper knew of Plaintiff's persistent erection and was deliberately indifferent to Plaintiff's serious medical needs.

Nevertheless, as Harper has asserted the defense of qualified immunity, Plaintiff has the heavy burden to show not only that his constitutional right was violated, but that the right was clearly established.  Plaintiff does not point to any case where an official acting under similar circumstances as Harper was held to have violated the Constitution.  Plaintiff has not met his heavy burden.  Accordingly, Harper is entitled to qualified immunity, and his motion is granted.

### _Dakota Morgan – Detention Officer_[27]

During the relevant period, Dakota Morgan worked two day shifts from 6:00 a.m. to 6:00 p.m. on Friday and Saturday, December 16 and 17.[28]  Dakota Morgan worked in the tower from noon until 6:00 p.m. on Friday, December 16.  Plaintiff argues that he called the tower during that time complaining of his condition and pain.  Plaintiff further argues that consistent with

---

[25]     Plaintiff makes no claims against Daniel Harper with regard to being taken directly from MRHC to St. Francis.

[26]     _Lance Depo., Docket No. 172-11 at 30-32._

[27]     Plaintiff makes no claims against Dakota Morgan with regard to being taken directly from MRHC to St. Francis.

[28]     Dakota Morgan also worked a day shift on Thursday, December 15, but would have been finished with his shift by the time Plaintiff took the trazadone.

Oklahoma's jail standards, Dakota Morgan would have performed a total of seven sight checks from noon to 6:00 p.m. on December 16, 2016, and that there is no evidence that Dakota Morgan failed to conduct these hourly sight checks. *Docket No. 197, UMF #s 9 & 10.* While Plaintiff did not have any specific testimony about speaking with Dakota Morgan,[29] viewing the facts in the light most favorable to Plaintiff there is a genuine issue of material fact as to whether Dakota Morgan knew of Plaintiff's persistent erection and was deliberately indifferent to Plaintiff's serious medical needs.

Nevertheless, as Dakota Morgan has asserted the defense of qualified immunity, Plaintiff has the heavy burden to show not only that his constitutional right was violated, but that the right was clearly established. Plaintiff does not point to any case where an official acting under similar circumstances as Dakota Morgan was held to have violated the Constitution. Plaintiff has not met his heavy burden. Accordingly, Harper is entitled to qualified immunity, and his motion is granted.

### Joel Kerns – Former Sheriff

Plaintiff claims that Kerns failed to adequately train the jailer Defendants, that he failed to provide any supervision or oversight, and that he adopted and enforced unconstitutional policies or practices that permitted the jailer Defendants to ignore his medical needs and his physician's orders. Kerns had no personal contact with Plaintiff or direct and contemporaneous knowledge of Plaintiff's treatment by jail officials during the relevant period.

Thus, for Plaintiff to prevail on his supervisory claims against Kerns, he must show an "affirmative link" between Kerns and a constitutional violation. *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015). To show an "affirmative link" between Kerns and the alleged

---

[29]     *Lance Depo., Docket No. 172-11 at 236.*

constitutional harm, Plaintiff must show: "(1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind." *Id*. (citing *Dodds v. Richardson,* 614 F.3d 1185, 1195 (10th Cir. 2010)). Plaintiff has failed to establish all three prongs.

First, as to the failure to get Plaintiff medical care over the weekend, Plaintiff has not shown that any policy or practice caused the failure. In fact, the policies instructed jailers to go up the chain of command as necessary to get inmates needed medical assistance. The Defendant jailers were trained by state standards and also given on-the-job mentoring. Plaintiff has failed to show any personal involvement by Kerns, supervisory or otherwise, in the alleged constitutional violation. Plaintiff failed to show any causal connection between Kerns' training, supervision, policies or practices and the alleged constitutional violation. Plaintiff has also failed to show that Kerns was deliberately indifferent to any such failure.

Second, Plaintiff argues that his constitutional rights were violated because he was not taken by ambulance directly from MRHC to St. Francis. Plaintiff argues that Kerns's policies and practices caused this violation of his rights. Dr. Lee directed that Plaintiff be transported to St. Francis immediately, but did not indicate on the transfer request form the means by which Plaintiff was to be transported. Plaintiff was transported back to the jail to be released on a medical recognizance bond. The total amount of time between Dr. Lee's direction and Plaintiff being released from the jail was less than two hours. When Plaintiff was released, Nurse Crawford told his father that he needed to be transported directly to St. Francis. Rather than transport him directly to St. Francis, his father ran errands and took him to St. Francis nearly five hours later.

"Where a prisoner claims that harm was caused by a delay in medical treatment, he must 'show that the delay resulted in substantial harm' in order to satisfy the objective prong of the

deliberate indifference test." *Al-Turki*, 762 F.3d at 1193.  Plaintiff has not shown that the less than two-hour delay in releasing him on the medical recognizance bond resulted in substantial harm.  Moreover, Plaintiff has failed to show any personal involvement, sufficient causal connection, or culpable state of mind.

Sheriff Kerns has also asserted the defense of qualified immunity.  Plaintiff, therefore, has the heavy burden to show not only that his constitutional rights were violated, but that the rights were clearly established.  Plaintiff must show that "clearly established law . . . would . . . have put a reasonable official in [Kerns'] position on notice that his *supervisory conduct* would" violate Plaintiff's constitutional rights.  *Perry*, 892 F.3d 1123.  Plaintiff has not pointed to any case where an official acting under similar circumstances as Kerns was held to have violated the Constitution.  Plaintiff has not met his heavy burden.  Accordingly, Kerns is entitled to qualified immunity, and his motion is granted.

## VI.    Official Capacity Claims Against Sheriff Morris

Plaintiff brings a claim against Sheriff Morris in his official capacity under § 1983 for indifferent training and supervision and for unconstitutional policies or practices to deny adequate medical care.  For Plaintiff to prevail, he must show an underlying constitutional violation and that such violation was caused by a policy, practice, or custom of the PCCJC or that an official with final policy-making authority, *i.e.* former Sheriff Kerns, personally participated in the alleged violation.  *Board of Cnty. Comm'rs. Of Bryan Cnty., Okl. V. Brown*, 530 U.S. 397, 402-06 (1997).

As the court held above, Plaintiff has failed to show that any violation was caused by a policy, practice or custom of the PCCJC or that former Sheriff Kerns personally participated in any alleged violation. Accordingly, Sheriff Morris' motion for summary judgment is granted.

## VII.  Conclusion

For the reasons set forth herein, the motions for summary judgment are disposed of as follows:

- The motion by the Board [Docket No. 135] is GRANTED.

- The motion by Edward Morgan [Docket No. 129] is GRANTED.

- The motion by Mike Smead [Docket No. 131] is GRANTED.

- The motion by Daniel Harper, Dakota Morgan, and Stephen Sparks [Docket No. 137] is GRANTED.

- The motion by Joel Kerns [Docket No. 129] is GRANTED.

- The motion by Chris Morris [Docket No. 136] is GRANTED.

**IT IS SO ORDERED** this 20th day of September, 2019.

**THE HONORABLE RONALD A. WHITE**
**UNITED STATES DISTRICT JUDGE**
**EASTERN DISTRICT OF OKLAHOMA**